Albert JACKSON, Plaintiff,

Donnie McKoy, Plaintiff,

Dawn Pitt, Plaintiff,

v.

The DELAWARE RIVER AND
BAY AUTHORITY, et al.,
Defendants.

No. 99–3185 (JBS).

United States District Court,
D. New Jersey.

June 6, 2002.

See also 2001 WL 1689880.

Joseph C. Grassi, Frank L. Corrado, Rossi, Barry, Corrado, Grassi & Radell, P.C., Wildwood, NJ, for Plaintiffs.

John T. Kelley, Kelley, Wardell & Craig, LLP, Haddonfield, NJ, for Defendants.

**OPINION**

SIMANDLE, District Judge.

Presently before this Court is defendants' motion for summary judgment on plaintiff Albert Jackson's First Amendment/retaliation claim pursuant to 42 U.S.C. § 1983.[1] Oral argument was heard on April 18, 2002. This First Amendment/retaliation claim was filed in a Supplemental Complaint, pursuant to the October 12, 2001 Order of the Honorable Joel B. Rosen, U.S.M.J. Plaintiff Albert Jackson ("Jackson") alleges that defendants Jeff Lewis ("Lewis") and the DRBA violated his right to free speech when they subjected him to an internal investigation and 3–day suspension after Jackson spoke at a Town of Smyrna public meeting and expressed negative views about their mayor, a former DRBA commissioner. For the reasons stated herein, and because this Court finds as a matter of law that plaintiff Jackson's speech did not involve a matter of public concern and also that the value of plaintiff's speech was outweighed by the DRBA's interest in the effective and efficient fulfillment of its responsibilities to the public, defendants' motion for summary judgment on Jackson's First Amendment retaliation claim will be granted, and Count V of the Supplemental Complaint will be dismissed.

## 1. FACTS

The facts of the underlying case involving the relationship of the parties and plaintiffs' complaints of hostile work environment, discussed at length in this Court's earlier summary judgment Opinion, will not be recounted herein. (*See Jackson v. DRBA*, No. 99–3185, 2001 WL 1689880 (D.N.J. Nov.26, 2001).)

---

1. Plaintiff Jackson does not actually cite 42 U.S.C. § 1983 in his Supplemental Complaint and First Amendment/retaliation claim. However, since he seeks redress from alleged constitutional violations against defendants, who are state actors in a bi-state agency, it appears that he must use that vehicle.

On July 2, 2001, Jackson attended a public meeting of the town council in Smyrna, Delaware. (Kelley Aff., Defs.' Ex. B, Jackson Dep., Tr. 226.) Jackson learned of the meeting through a newspaper article. (Compl., ¶¶ 4–5.) Mark Schaeffer, a former commissioner of the DRBA, was the Mayor of Smyrna at the time and was engaged in a "highly publicized dispute with the serving town manager, Michael Jacobs, over whether Jacobs should continue in his position." (Compl., ¶¶ 2–3.) Jackson attended the meeting in his DRBA uniform, advised the attendees that he was a DRBA employee and a non-resident of Smyrna, and, during the open portion of the meeting, made negative comments about Schaeffer's former tenure at DRBA. (Compl., ¶ 7.) Jackson asserts that he developed a poor opinion of Schaeffer's qualifications and management abilities while Schaeffer was DRBA commissioner, which prompted him to attend the meeting and speak out. (Compl., ¶ 6.)

Mr. Jackson's comments at the town meeting were as follows:

Jackson: (In Ferry uniform) My name is Albert Jackson. I work for the Delaware River and Bay Authority, and I live in Long Neck Delaware down in Sussex County.

And I read about Mr. Schaeffer and the problems that you fine people are having up here.

I never came up here to get involved or anything like that but I just wanted to come up and give you some comments because the workers at the DRBA have caught hell.

(Inaudible, clock chiming in the background) As a Delaware and Bay Authority Commissioner, and I just wanted to alert you all, he's overseen a lot of problems that we were having there and uh, I just wanted to make sure you have good checks and balances on Mr.

Schaeffer for all the things the workers, and problems have has at the Authority.

He was Commissioner in charge of police or whatever, and DRBA's police have caught more hell and they are run so poorly by terrible management.

I'm not going to take up much of your time, but I just wanted to know you, the many problems we faced at the DRBA.

The FDA shut down our food service. They had three inspections. The people that ran the food service were poorly trained and they weren't even paid a living wage, and 98% of the people, the workers were women.

So uh, they refurbished a boat. The Twin Capes and the Cape-May, two very big boats, and the cost overruns were like $21 million. And they could have built a brand new boat for $25 million.

And, this old boat that they put all this steel on which is top heavy and the center of gravity is real high, uh, it cost like $46 million, and they used foreign people. They bought foreign furniture and there was no economic development basically for the States of Delaware and New Jersey. It was set up for the benefit of the citizens of Delaware and New Jersey.

Um, I would hope that town council and Mayor Schaeffer would go to the DRBA and try to get some economic development because they're flush with money and you guys should get your fair share because they give it to everybody else, especially foreigners. So you guys should get your share.

Um, I just wanted to leave one more thing with you before I go, um, like I said before, that your checks and balances are on Mr. Schaeffer. It's very, very strange that all of a sudden he's uh, holier than thou, when he wasn't that was when he was with the DRBA.

Thank you very much. (Applause).

(Kelley Aff., Ex. C, Smyrna Town Council Meeting, Jul. 2, 2001.)

As a result of Jackson's comments at the Smyrna Town Council meeting, defendant Jeffrey D. Lewis ("Lewis"), the DRBA's Chief Operating Officer, advised Jackson by letter, dated July 25, 2001, that his conduct would be investigated by Elizabeth Malloy, Esquire. (Defs.' Stmt. Of Facts, ¶ 9; Kelley Aff., Ex. D, Letter from Lewis to Jackson, Jul. 25, 2001).[2] Malloy submitted a report to the DRBA (dated October 10, 2001) at the culmination of her investigation. (Defs.' Facts, ¶ 10; Kelley Aff., Ex. A.)

The stated purpose of the Malloy Investigation was "to determine whether Mr. Jackson has engaged in a pattern of bringing false and unfounded allegations against current or former Authority personnel." (*Id.* at 3.) Ms. Malloy, an attorney in DRBA's labor law firm of Klett, Rooney, Lieber & Shorling, but who previously did not work on DRBA matters, invited Mr. Jackson to participate in the investigation, but Mr. Jackson's attorney, Joseph C. Grassi, Esquire, objected to her request to interview Jackson. (Grassi Aff., Ex. E., Letter from Grassi to Lewis of 8/8/01.) Ms. Malloy wrote back to Mr. Grassi, to advise that she was investigating three matters: "(1) whether Mr. Jackson has engaged in a pattern of bringing false and unfounded allegations against current or former Authority personnel; (2) an official complaint by Captain Woehlcke against Mr. Jackson; and (3) an official complaint by Mate Hanley against Mr. Jackson." (Grassi Aff., Ex. E, Letter from Malloy to Grassi of 9/12/01.) She again asked to speak with Mr. Jackson and asked for his cooperation in the investigation by speaking with her. (*Id.*)

According to her "Report by the Investigating Officer," dated October 10, 2001 (Kelley Aff., Ex. A, *supra*), Malloy reviewed various files, documents and interviewed ten persons. (*Id.* at 1–3.) She addressed a total of eighteen (18) complaints by Jackson, or other incidents involving Jackson, from April 13, 1998 to August 30, 2001, of which Jackson's appearance at Smyrna on July 2nd was Item No. 17. Ms. Malloy reached an opinion that many of Jackson's complaints were unfounded, and recommended that the DRBA consider imposing appropriate discipline. (*Id.* at 15–17.) Ms. Malloy also reached a conclusion that Johnson's frequent complaints "cause disharmony at

**2.** Specifically, the body of Mr. Lewis' letter to Mr. Jackson, dated July 25, 2001, states as follows:

The Delaware River and Bay Authority (the "DRBA" or the "Authority") has been advised that on July 2, 2001, you attended a Smyrna Town Council meeting wearing your DRBA uniform, identified yourself as a DRBA employee, and made various unfounded statements about the DRBA, its vessels and operations. Some of your comments included statements to the effect that a DRBA ferry vessel may be structurally unsafe and that the Authority Police are poorly run and poorly managed.

Your reported behavior at that meeting appears to be a continuation of a pattern of behavior by you of bringing false and unfounded allegations against current and former Authority personnel. False and unfounded claims of harassment are a violation of the Authority's Personnel policy and involve a waste of time, money, and manpower resources.

Since some of your complaints have been directed against me and other Authority managers, the Authority has asked Elizabeth Malloy, Esquire, of the law firm Klett, Rooney, Lieber & Schorling to conduct an independent investigation concerning your conduct. The Authority has requested that upon completion of the investigation that she make a recommendation of corrective action, up to and including discharge, if appropriate. Ms. Malloy will contact you directly when she is prepared to interview you. (Kelley Aff., Ex. D, Letter from Lewis to Jackson, Jul. 25, 2001)

best, and possibly an unsafe condition," since many of his complaints are directed against fellow seamen and superior offices on his vessel. (*Id.* at 17–18.) Ms. Malloy's report observed that "many of Jackson's complaints are stated in confrontational terms, and he has taken that stance in the investigations." (*Id.* at 19.)

Regarding the Smyrna Town Council episode, Malloy's report opined that various comments by Jackson at the meeting were "false and unfounded." (*Id.* at 13.) These included his remarks about DRBA police mismanagement (as the police force is accredited and there have never even been complaints by Jackson or anyone else about police mismanagement); his remarks about food service workers not being paid a living wage (finding adequate salaries well in excess of minimum wage, together with overtime and full employee benefits); his remarks about creating a ferry that is top heavy and with a center of gravity that is "real high," to the extent the remark implies that the vessel was unstable or unsafe (explaining stability letters by Coast Guard finding adequate stability for each ship, confirmed by inspections twice yearly by the American Bureau of Shipping, and noting that the stability letters are posted, and that Mr. Jackson has never complained about instability or refused to work on the vessels). (*Id.* at 13.) Ms. Malloy also expressed her finding that the Smyrna Town Council was "an inappropriate forum to address issues regarding the stability of the Ferry's ships, the wages of the food service workers and the management of the DRBA police." (*Id.*) [3]

Based on the Malloy Report, and based upon Mr. Jackson's alleged "insubordination in refusing to cooperate with the in-

vestigation," defendant Lewis, as Chief Operating Officer, found good cause to suspend Mr. Jackson for three days without pay. (Grassi Aff., Ex. G, Letter from Lewis to Jackson of 12/7/01.) On October 12, 2001, Mr. Jackson filed a Supplemental Complaint, asserting a First Amendment/retaliation claim in Count V, related to his three-day suspension arising from his comments before the Smyrna Town Council. On March 28, 2002, defendants filed the instant motion to dismiss Count V of plaintiff Jackson's Supplemental Complaint.

## 2. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. *Id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.*

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "[T]he nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999)

---

3. Ms. Malloy's findings regarding the other 17 items are not repeated here, but they formed the bulk of her report, and the large number of allegedly unfounded accusations by Jack-

son against other DRBA employees, rather than his remarks in Smyrna, form the dominant concern.

(quoting *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505; *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 329–30 (3d Cir.1995) (citation omitted).

The moving parties, here the defendants, always bear the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Jalil v. Avdel Corp.*, 873 F.2d 701, 706 (3d Cir.1989), *cert. denied*, 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). However, where the nonmoving party bears the burden of persuasion at trial, as in the present case, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548.

The non-moving party, here the plaintiff, "may not rest upon the mere allegations or denials of" its pleading in order to show the existence of a genuine issue. Fed. R.Civ.P. 56(e). Plaintiff must do more than rely only "upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.1985), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985) (citation omitted); *see Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505.

## 3. DISCUSSION

■ The First Amendment to the United States Constitution protects statements by public employees on matters of public concern. *See Pickering v. Board of Educ. Of Township High School District 205*, 391 U.S. 563, 573, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Cooper v. Cape May County Board of Social Services*, 175 F.Supp.2d 732, 743 (D.N.J.2001). "[T]he Supreme Court has sought to prevent 'a State [from] condition[ing] public employment on a basis that infringes the employee's constitutionally protected interest in a freedom of expression.'" *Zamboni v. Stamler*, 847 F.2d 73, 76–77 (3d Cir.1988) (quoting *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)); *Cooper*, 175 F.Supp.2d at 743. Pursuant to 42 U.S.C. § 1983, public employees, such as Mr. Jackson, may sue to enforce the constitutional protection of their speech if: "'(1) they spoke on a matter of public concern; (2) their interest in that field outweighs the government's concern with the effective and efficient fulfillment of its responsibilities to the public; (3) the speech caused the retaliation; and (4) the adverse employment decision would not have occurred but for the speech.'" *Kadetsky v. Egg Harbor Twp. Bd. of Educ.*, 164 F.Supp.2d 425, 434 (D.N.J.2001) (citing *Fogarty v. Boles*, 121 F.3d 886, 888 (3d Cir.1997)).

The Court assumes for this motion that there is no dispute that Mr. Jackson's speech at the Smyrna town meeting caused the investigation by Ms. Malloy, or that the investigation would not have occurred but for that speech. What this Court must decide, therefore, is whether Mr. Jackson's speech at the meeting, in sum and substance, was as an employee upon matters only of personal interest, which is not protected,[4] rather than as a

---

**4.** The Court makes no determination on issues not raised by the parties in this motion,

citizen upon matters of public concern, which is protected. If the Smyrna comments were protected, then the Court must balance the interests of the speaker and his State employer as required by *Pickering.*

■ In order to determine whether a public employee's speech is protected, this Court must determine whether Mr. Jackson's speech dealt with a matter of public concern. "A public employee's speech involves a matter of public concern if it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Cooper,* 175 F.Supp.2d at 744 (quoting *Green v. Philadelphia Housing Auth.,* 105 F.3d 882, 885 (3d Cir.1997); *Carlino v. Gloucester City High School,* 57 F.Supp.2d 1, (D.N.J. 1999)). Where the employee's speech "'cannot be fairly characterized as constituting speech on a matter of public concern,' the reasons for a discharge or other disciplinary action are not subject to scrutiny by the courts." *Czurlanis v. Albanese,* 721 F.2d 98, 103 (3d Cir.1983) (quoting *Connick,* 103 S.Ct. at 1689–90).

■ If and when a court decides that an employee's speech was on a matter of public concern, the court must next determine whether the employee's free speech right outweighs the state's countervailing interest as an employer on promoting the efficiency of the public services it provides through its employees. *Pickering,* 391

---

for example, whether Jackson's Smyrna remarks were a substantial reason for Lewis' imposition of the three-day suspension on December 7.2001, *supra,* in light of the overall pattern of allegedly false complaints against fellow employees, and plaintiff's refusal to cooperate in the investigation of this pattern of complaints. To the extent this nexus between the Smyrna comments and the discipline is disputed, this Court must assume, for purposes of this summary judgment motion, that the 3–day suspension imposed discipline for the Smyrna statements.

U.S. at 568, 88 S.Ct. 1731. In conducting this balancing, a factor to be considered is "the hierarchical proximity of the criticizing employee to the person or body criticized." *Sprague v. Fitzpatrick,* 546 F.2d 560, 564 (3d Cir.1976). Plaintiff bears the burden of proof on both of these points. *See Baldassare v. New Jersey,* 250 F.3d 188, 195 (3d Cir.2001).

■ The parties agree, and controlling case law confirms, that it is for the court, not the jury, to decide whether the speech at issue related to a matter of public concern, and to perform the *Pickering* balancing test.[5] *Feldman v. Philadelphia Housing Auth.,* 43 F.3d 823 (3d Cir.1994) (citing *Czurlanis,* 721 F.2d at 105 for the quotation: "As the Supreme Court made clear in *Connick,* it is the role of the court in a case alleging retaliatory action which violates the First Amendment to decide not only whether the speech at issue related to a matter of public concern, but also to conduct the necessary *Pickering* balancing.") Whether the speech at issue relates to a public concern is thus a question of law.

The distinction made by the Supreme Court in *Connick* between speech by a public employee "as a citizen upon matters of public concern" and speech by "an employee upon matters only of personal interest," is applicable here. 461 U.S. at 147, 103 S.Ct. 1684. The *Connick* Court wrote:

---

**5.** The Supreme Court indicated in *Pickering* that:

> The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. 391 U.S. at 568, 88 S.Ct. 1731.

We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

461 U.S. at 147, 103 S.Ct. 1684. An employee's motivation for speaking is " 'merely one factor to be considered, but [is] not necessarily controlling, in assessing the character of [the employee's] speech.' " *Zamboni v. Stamler*, 847 F.2d 73, 78 (3d Cir.1988) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1201 (3d Cir.1988)); *see also Cooper*, 175 F.Supp.2d at 744. The *Connick* Court further instructed that whether an employee's speech addressed a matter of public concern must be determined by the "content, form, and context of a given statement, as revealed by the whole record." *Czurlanis*, 721 F.2d at 103 (quoting *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684).

▇ This Court must therefore examine the content, form and context of Mr. Jackson's statement, recounted in full above and in Kelley Ex. C, to determine whether his statements involved matters of public import or his personal employee grievance. For the reasons now explained, this Court concludes, as a matter of law, that Mr. Jackson spoke as a DRBA employee upon a matter of personal interest to Mr. Jackson, rather than the public concern which was being addressed at the Smyrna meeting. Defendants argue that because Mr. Jackson wore his DRBA uniform and identified himself as a DRBA employee before recounting his dissatisfaction with former Commissioner Schaeffer at the DRBA, this Court should conclude that he was using the town meeting as a public forum in which to air his private antipathies toward the DRBA. Plaintiff asserts that he felt obligated to weigh in at the meeting in light of Mayor Schaeffer's public position and also in light of Schaeffer's public conflict with Jacobs.

Jackson testified at a deposition that his intention at the Smyrna meeting was not to talk about the public dispute between Schaeffer and the town business administrator, Michael Jacobs. (Jackson Dep. at 234:7–9.) He testified that his intention instead was "to tell the citizens of Smyrna that they had to keep close checks and balances on Mr. Schaeffer," and that Jackson had no opinion of Mr. Jacobs, "none whatsoever," before he went to the meeting. (Jackson Dep. at 234:10–18.) He testified that his motivation "was to show the hypocrisy of Commissioner Schaeffer." (*Id.* at 245:10–14.)

It is undisputed that Jackson was uninformed about the public controversy that brought him to the Smyrna Town Council. He had no opinion about the merits of whether Jacobs should be terminated and/or whether Jacobs should receive a severance. He knew nothing about Schaeffer's service as Mayor of Smyrna. His contribution to the public forum was his implied opinion that Schaeffer had not been an effective manager at DRBA, resulting in wasteful spending to refurbish a vessel, substandard wages to workers, and a mismanaged police force. Additionally, plaintiff's remarks were directed to Schaeffer's previous experience at DRBA, after Schaeffer no longer had any connection to DRBA at the time Jackson spoke.

Assessing the "content, form and context" of plaintiff's Smyrna comments is necessary to determine whether the First Amendment rights were infringed by defendants' investigation and discipline. The "content" of the remarks is not in dispute, and is set forth in full above. The "form" involved speaking in public on the record to the Smyrna Town Council, which had

convened a public hearing to solicit comments about the possible separation of the town manager, Michael Jacobs.

The "context" of Mr. Jackson's speech before the Smyrna Town Council is trickier. Against the backdrop of several years of complaints about racial harassment and other workplace issues, Mr. Jackson saw that a former DRBA commissioner was a town mayor who was involved in a public dispute with the town business administrator. Mr. Jackson lived about 45 miles away and had never paid attention to public affairs in Smyrna. Smyrna also lies at a considerable distance from the DRBA Ferry's operating terminal in Lewes, Delaware. He wore his DRBA uniform to the meeting and introduced himself as a DRBA employee. He was not specifically asked to speak, and he had no knowledge of the dispute and no view of the matter that the Town Council had to decide regarding the town business administrator. (*See* Kelly Aff., Ex. B, Tr. 271–272.)

Most of his remarks addressed the past managerial deficiencies he perceived at the DRBA regarding DRBA police, food services, and a top-heavy ferry boat. None of these subjects were of interest to the meeting, as Mr. Jackson admitted in his deposition. Further, he attempted to garner publicity for his remarks by speaking with various newspapers including the News Journal, the Sun Times, the Atlantic City Press, and the Cape Gazette, several of which are not distributed in the Smyrna, Delaware area. (Jackson Dep. at 245:23–251:10.) Those conversations with news reporters involved his observations on the DRBA, rather than the Schaeffer–Jacobs issue (*id.*), suggesting that his intention was to use the forum to gain publicity for his criticisms of his employer rather than the Smyrna issue. Additionally, the tone of Mr. Jackson's speech indicates that his primary motivation in speaking, although not dispositive of the issue here, was to

vent his distrust toward the DRBA on issues of safety and wages. It is, however, acknowledged that Mr. Jackson did not make specific reference to his personal problems at the DRBA, nor did he repeat his charges of retaliation by management against workers for complaints and a racially hostile work environment. None of Jackson's comments to the Smyrna meeting dealt with matters of race.

The evidence in this summary judgment record reveals that Mr. Jackson's speech, considered in its entirety, fails to qualify as speech which concerns a matter of public interest to the Smyrna forum. Although Jackson attempted to use a public forum (the Smyrna Town Council meeting) as a means of disseminating his feelings of dissatisfaction with former DRBA commissioner Schaeffer and the DRBA, Jackson's comments had little to nothing to do with the public topic of the Council Meeting (*i.e.*, whether Mr. Jacobs should be removed from his position as Smyrna Town Business Administrator), and essentially everything to do with his personal disdain for the DRBA, which he chose to vent publicly. The record indicates that Mr. Jackson went to the meeting uninvited and uninformed about the public dispute in his DRBA uniform, identified himself as a DRBA employee, and notified newspapers about his disparaging comments concerning a number of alleged safety and managerial problems at the DRBA for his own personal reasons.

 Additionally, applying the *Pickering* test, the Court finds that even if Mr. Jackson's speech were determined to be upon a matter of public concern, namely, Schaeffer's fitness as Mayor, the DRBA's interest in maintaining public services in a safe and efficient manner outweighed any interest that Mr. Jackson may have had in his speech to the Town Council, taken as a whole, *supra.* The DRBA has a strong

 

interest in ensuring that its employees who work on vessels, such as Mr. Jackson, do not make negative public statements that are untrue about the safety of those vessels, particularly when the vessels are certified by the proper authorities as seaworthy, and about the competence of the DRBA police where no basis for suggesting police incompetence exists in the record.[6] Upon this record, the DRBA has demonstrated that its concern with the effective and efficient fulfillment of its responsibilities to the public in matters of maritime safety and police performance outweigh employee Jackson's interest in venting his grievances against his employer through the oblique method of the Smyrna Town Council, under these circumstances. Mr. Jackson's interest in publicly venting his grievances against the DRBA, even in the context of Schaeffer's present performance as Smyrna Mayor, do not outweigh the DRBA's concerns.

## 4. CONCLUSION

For the reasons stated herein, this Court finds that Mr. Jackson has failed to raise genuine issues of material fact as to whether his speech before the Town Council of Smyrna was a matter of public concern or, alternatively, that his interest in such public speech would have outweighed the DRBA's interest in promoting the efficiency of its public services. Defendants' motion for summary judgment on Count V of the Supplemental Complaint will therefore be granted, and plaintiff Jackson's

First Amendment/retaliation claim will be dismissed with prejudice.

---

[6] In the *Pickering* balancing of interests test, the Court is to strike the balance as a matter of law under *Feldman* and *Czurlanis, supra*. As part of that balancing, the Court may consider the accuracy of the employee's statements and the employee's motivation in making the statements. *Swineford v. Snyder County, Pennsylvania*, 15 F.3d 1258, 1272,

1274 (3d Cir.1994). The Court finds upon this record that the statements regarding DRBA police competence, vessel stability, and food service pay and benefits were misleading or false, and therefore subject to diminished protection from an adverse employment action. *Id.* at 1274.